JOHNSON, Circuit Judge
(concurring in part and dissenting in part).
[¶43.] I concur with the majority’s holding that, with respect to One Star, the circuit court should have granted Sisters’ motion for summary judgment. As the majority correctly notes, One Star’s response to the newspaper advertisement presumptively established that by May of 2001 he was on inquiry notice of the causal connection between the acts of abuse at *684 the St. Francis Mission School and his current condition. Armed with this knowledge, and pursuant to SDCL 26-10-25, One Star had a three-year period in which to commence a lawsuit against Sisters. His failure to commence suit within that time period renders summary judgment appropriate.
[¶ 44.] I disagree with the Court’s similar finding as to Sorace. Contrary to the majority’s assertion, Sisters has not met its burden of presumptively establishing that “Sorace commenced her case more than three years after she was on actual and inquiry notice that her injuries were caused by the abuse.” Supra ¶ 21.
[¶ 45.] In attempting to make this showing, Sisters relies exclusively on So-race’s deposition testimony. The gist of this testimony provides:
Q: So in [19]95, when you remembered, when you were talking to this young lady ... and you called Ron Oney and he said that’s what I was trying to get at, that’s what I was trying to figure out your anger and those things, is that what he told you?
A: Uh-huh, and then I never went back to him, and so three-three months later he calls [Beauvais] and asks-has asked [Beauvais] how I was doing. And [Be-auvais] said, well, you know, she’s still an angry woman. She’s still an angry lady, and Ron [Oney] was trying to have him talk to me to go back to him, but I couldn’t-I couldn’t pay for the ninety bucks a session.
It is true that Oney, a mental health professional, and Beauvais, a friend of Sorace and the holder of a doctorate in an unspecified field, may have made the connection between Sorace’s anger issues and the sexual abuse she endured many years before. The determinative question, however, is not whether a trained professional could make the causal connection. Rather, the statute of limitations begins to run “when facts come to light that would prompt a reasonably prudent person to seek out information regarding his or her injury or condition and its cause.” Supra ¶ 18 (emphasis added).
[¶46.] Oney’s “specific advisement” to Sorace of the causal relationship between her problems and the abuse was ambiguous at best, and at worst, provided no notice at all. Sorace’s deposition testimony established little more than the fact that her recollection of abuse was something Oney deemed important in his counseling sessions with Sorace when trying to diagnose her problems with anger. This, however, does not equate to a general finding that Sorace or a reasonably prudent person in her position would have made the connection between the acts of abuse and her current condition, and cannot as a matter of law be said to have afforded Sorace the type of notice she was owed under SDCL 26-10-25.
[¶ 47.] In its effort to show that Sorace was on both actual and inquiry notice in 1995, the majority analogizes to the Fri-deres case. The facts of Frideres are materially distinguishable from those presently before the Court. Frideres had always retained some memory of her abuse. So-race, on the other hand, had repressed her boarding school memories for quite some time. Only after beginning counseling sessions and talking with another girl who had been sexually abused was Sorace able to recall her abuse.
[¶ 48.] More importantly, Frideres had previously consulted with other professionals regarding her abuse and symptoms of depression, and had received specific advice from these professionals associating the abuse and her current condition. As early as 1982 — eight years before speaking with a clinical psychologist — she had sought help from her family physician for feelings of depression. Her doctor recom *685 mended that she seek further professional help or try an antidepressant drug. In 1988 she had spoken with her priest about the abuse. The priest specifically advised her to “seek professional help for the difficulties she was experiencing as a result of the abuse.” Frideres, 113 F.3d at 898 (emphasis added). Thus, Frideres had been clearly informed of the cause of her problems at least several years prior to filing suit. In contrast, Sorace had minimal contact with any medical, psychological, or clerical professionals prior to her treatment with Dr. Snow. It is true that Sorace had gone to counseling with Ron Oney in 1995, but she did not discuss her abuse with him at that time, because she could not remember it. Sorace’s memories of abuse came back later in 1995, but her only subsequent contact with Oney was a phone call. After telling Oney that she had indeed been sexually abused as a child, he vaguely suggested that “that’s what I was trying to get out of you.” Oney’s advice lacked the clarity present in Frideres and would not “prompt a reasonably prudent person to seek out information regarding his or her injury or condition and its cause.” Supra ¶ 18.
[¶ 49.] Even if Sorace’s deposition testimony was sufficient to presumptively establish actual or inquiry notice, I disagree with the majority’s holding that Sorace has “failed to raise a specific issue of material fact disputing her 1995 discovery of the abuse and some of the injury caused by that abuse.” Supra ¶ 26. Dr. Snow’s affidavit does exactly that.
[¶ 50.] In his affidavit, Dr. Snow diagnoses Sorace’s condition as Chronic Post-traumatic Stress Disorder and states that Sorace “was not emotionally and/or psychologically equipped to recognize that condition as being related to the sexual abuse trauma[.]” He then explains the self-concealing nature of childhood sexual abuse, noting that “[t]he memories and understanding of the effects of the trauma are, therefore, not otherwise fully understood, appreciated, or, in some instances, even remembered by the victim.” Indeed, this Court has previously recognized the repressive symptoms that a victim of childhood sexual abuse may endure:
Imagine being pricked on the arm with a pin. At first, such an intrusion would be disturbing, but with time might seem uneventful. Now imagine the pin carried a dreaded affliction, only discoverable after years of incubation. Such is often the nature of childhood sexual abuse. Many children only realize years later the true significance of the abuse they endured, especially in cases where the molestation occurred at the hands of family members or other trusted individuals. For some children, sexual violation is so traumatic it becomes psychologically self-concealing, if only to preserve sanity. For this reason, our Legislature enacted SDCL 26-10-25 creating a discovery rule for adult survivors of child sex abuse.
Stratmeyer, 1997 SD 97, ¶ 13, 567 N.W.2d at 222-23. Sexual abuse at an early age prompts involuntary coping mechanisms which can prevent victims from making the causal connection between their past abuse and the psychological problems they experience as adults. Id. ¶ 19, 567 N.W.2d at 224. According to Dr. Snow, these combined circumstances made it “unrealistic for Ms. Sorace to comprehend or otherwise discover that she suffered from the condition I have diagnosed, as a result of the childhood sexual abuse, without counseling[.]”
[¶ 51.] Nevertheless, the Court disregards Dr. Snow’s 2006 diagnosis as “irrelevant,” arguing that it merely represents the subsequent discovery of a “new injury.” Supra ¶24. The Court reads Dr. Snow’s affidavit too narrowly. Chronic Posttraumatic Stress Disorder is not a *686 “new injury,” but rather a specialized medical/psychological term encompassing and describing the symptoms that Sorace had previously exhibited,' ie., anger management problems. These same problems, regardless of their name, have resonated in Sorace for many years and yet, until recently, Sorace was unable to make the connection between the abuse and her anger issues. Dr. Snow’s affidavit explaining the self-concealing nature of childhood sexual abuse provides a rational justification for Sorace’s inability to bridge the gap and thus satisfies Sorace’s burden.
[¶ 52.] Additionally, in explaining the circumstances present in this case-the self-concealing nature of childhood sexual abuse, the emotional and psychological instability of the victim, and the fact that the abuse took place under the supervision and control of priests and other affiliates of the church — the affidavit at least implicitly suggests that it would have been unrealistic for anyone in Sorace’s position to associate her anger problems with the acts of abuse. As the Court acknowledges, such a showing may create a material issue of disputed fact. Supra n. 3. Here, Dr. Snow’s affidavit raises a material issue as to whether Sorace’s actions in not filing suit sooner were reasonable. The circuit court’s denial of summary judgment as to Sorace was appropriate.
[¶ 53.] For these reasons, I respectfully dissent.